## CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed October 30, 1928.

THE ELECTRIC PUBLIC UTILITIES COMPANY
VS.
PUBLIC SERVICE COMMISSION, ETC.

*Miles & Edgett* and *Maloy, Brady & Yost* for petitioners.

*Raymond S. Williams*, Acting General Counsel, for Public Service Commission.

O'DUNNE, J. (sitting as of Circuit Court No. 2)—

One O'Hara owned all the stock of four electric companies involved in this application. He sold the entire stock of the four companies to representatives of the petitioner (which is an electric company in the form of a holding company) for the sum of $468,000, subject to the $50,000 of mortgages outstanding on the said companies. The purchase price has been paid O'Hara. When the certificates of stock were sought to be transferred to the petitioner (Electric Co. Holding Co.) it was surprised to learn that *consent to the transfer* had to be first had by the Public Service Commission of Maryland, and it then formally made application for such consent.

On the first hearing before the Commission it was refused; ground assigned was that it had not been shown to be in the public interest. Appeal was prosecuted by the petitioner to the

Circuit Court No. 2, which sustained the Commission. On appeal to the Court of Appeals this was reversed. (Opinion by Adkins, J., Daily Record, February 18, 1928.)

Said our Court of Appeals (referring to the Public Service Commission) :

"It is not their province to insist that the public shall be *benefited*, as a condition to the change of ownership, but their duty is to see that no such change shall be made as would work a *public detriment*."

Whereupon, the cause was remanded to the Public Service Commission by the Court of Appeals for further proceedings.

Whereupon the Public Service Commission went through the form of "further proceedings" and adopted the formulae prescribed by the Court of Appeals, and in its order of April 26, 1928, said that the application of the four companies named, to transfer the certificates of their capital stock to the petitioner, which has agreed to pledge the said stock under a trust agreement with the Guaranty Trust Company of New York to secure collateral gold bonds to be issued thereunder, *"would be detrimental to the public interest"* and therefore denied and dismissed the petition.

From that order appeal is prosecuted to the Circuit Court No. 2 and by request of counsel and consent of chancellor presiding in Circuit Court No. 2, submitted in summer recess to this Circuit Court.

Examining the record, and referring as briefly as possible to the facts and to the law, so as not to unduly prolong this opinion, the situation seems to be based on a difference of opinion among engineering experts as to the valuation of the said four electric light properties, and also to some difference of opinion among experts as to the various factors which enter into the somewhat complicated question of valuation of properties and the proportionate *weight* to be given *each* of the several factors. The *result* being as follows : The Chief Engineer of the Commission summarizes his findings on value as follows :

"It is my opinion that the combined properties of these four companies, including all tangible and intangible values, and *neglecting any capitaliza-*

*tion of earning power*, were worth under date of December 31, 1927, for *sale purposes*, $315,750."

"I might say that I arrived at that figure by consideration of the present cost of reproduction new less depreciation, by some consideration of the original costs, and what I think to be a fair, sound value of the properties for sale purposes."

It seems apparent from the testimony of Mr. Wolf, Chief Engineer of the Commission, in the original hearing, that he draws no sharp distinction between valuations computed for rate making purposes and for sale of securities, but on page 73 of present record says vaguely, it is true, that he has given the companies the benefit of the doubt as to certain property which "wouldn't be used and useful, but would be transferred."

Contrasted with his expert opinion on valuation, computed on such basis, and for sale purposes, is the conclusion of Engineers Day and Zimmerman, admittedly outstanding engineers of high repute.

Their valuation is $468,000, subject to the $50,000 outstanding bond issue, or a total of $518,000.

Chairman West, of Public Service Commission, to Mr. Nodder, Chief Auditor of the Commission (this record, p. 101) :

"Chairman: One moment, Mr. Nodder. You have got here the net income of these four companies, $31,647.21.

"Witness (Mr. Nodder) : 'Yes, sir.'

"Chairman: 'What return would that be on the price the company proposes to pay for these properties including the assumption of $50,000 bond issue which figures $518,000?'

"Witness: 'Mr. West, that would be based on the amount of net operating income shown about five or six lines about, $36,785. 1 can give you that figure readily. That would be just a little over 7 per cent. That's at present rates. That's 1927 earnings.' "

Mr. Martz, who made the appraisal for the petitioners, on behalf of firm of Day & Zimmerman, engineers, on page 128, present record, says :

"We took the gross earnings of this company for the year ending December 31, 1926, and deducted from that 5 per cent. for depreciation and capi-

talized the remainder, and that gave us a value of $600,000, on the basis of actual earnings of the company for 1926."

Commissioner Harper: "Did that indicate to your mind that the rates might have been a little high?"

The Witness: "Now that's the first consideration we have. Are these rates too high, because certainly we cannot say whether the rates are reasonable. You only can say whether the rates are reasonable, and therefore we cannot put ourselves in your position, but the only tests we have of that is what are the rates for comparable service in the general vicinity in which the properties happen to be located, or in general what's our experience elsewhere throughout the country, but more particularly in the particular territory in which the properties are located.

"Now we find that the rates on these properties, the top lighting rates, which is a large measure of what the rates really are, are 10 cents, 9 cents, 11.4 cents and 11.4 cents. Those rates are not out of line with the rates for comparable service of The Potomac Edison Company, their rural service, which applies in that territory down there, and presumably would apply in these small towns if they had these properties, which I understand are 9.6 cents, their top rate for their lighting service.

"We, looking at that and considering the fact that a 9 and 10 cent rate is not high for that class of service, felt that these rates were certainly not very much out of line from that standpoint, but with those rates they were able to earn on our basis on a capitalized value of $600,000. We discounted that to the extent of $100,000, bringing that down to $500,000.

"In doing that we felt that the company might have to make even further concessions in those rates. I am trying to frankly tell you what our considerations were in coming into this thing from the outside without prejudice.

(A rate investigation is then ordered and said to be still pending.) Full details of each engineer's analysis are set forth in elaborate exhibits.

A basic fact in this case still remains and must not be lost sight of.

We have no such paternalism in government which undertakes to substitute the Public Service Commission as the board of directors of private business enterprises even of a quasi-public character, or of those charged with a public interest. Commissions are at best the Legislature's sentinels posted in the public interest to prevent manifest public detriment, but it was never intended that private property, and such freedom to contract as still exists, and those rights which go under the general caption of "pursuit of happiness," for the protection of which governments were ordained, should be subject to the administrative whims of legislative agencies ordained clearly for the protection of public interest, against manifest public detriment. There is a growing tendency among administrative boards and zoning commissions in the too sincere and zealous administration of their public functions, to assume there is committed to their delicate administrative discretion, the "general welfare" of government which can be best promoted solely by a rigid adherence to the laws of the land amply elastic for the protection of life, liberty and property, according to anciently established, and long continued, firmly recognized and adequately applied in the legal forums of the Courts, with that sacred safeguard of the rights of one and all, by appeal to the Court of last resort, to which all bow with the utmost confidence in its final arbitrament of all matters legal.

The other fact which must not be lost sight of is that this is not an application to *issue bonds*, or local securities, to the investing public, based on a *definite valuation of these properties*, at *the fixed figure of* $518,000, but is an application of a person (though a corporate person) who has bought the total stock certificates of these four companies for the sum of $468,000 (subject to $50,000 still carried as a lien on the properties) and which petitioner has contracted to deposit them, along with other collateral, aggregating some $7,000,000, of which this is rated in the whole on the basis of $518,000, the deposit to be made with the Guaranty Trust Co. of New York, at New York, against which total collateral of some $7,000,000 said trust company is to issue $4,000,000 of its bonds. Therefore, there is, or there

may be, room for some difference of opinion among experts, depending on various standards for computation, and the difference of opinion as to future possibilities for increasing the sale of kilowatt hours by further educating a rural community to the advantages and convenience of electric current for pumping of water on the farm by electric motor against the hand-drawn "old oaken bucket" or the windmill; or the electric washing machine against the scrubbing board back breaker; or whether the winter wood can more efficiently be sawed by electric motor than by a leather belt attached to the farm flivver; whether lawn mowers, run by an electric cord, are more adapted to the use of the tired farmer than pushing the old style hand mower after the day's work. On all such questions an optimistic and forward looking electric company may well be willing to hazard an investment, which, to a more conservative or backward looking mind, may seem unwarranted by the past history of a rural community. We are living in an age of progress. The "Graf Zeppelin" is now seeking $14,000,000 for investment in transatlantic Zeppelins. Who is wise enough to predict that such investment based on advanced transportation thought will be detrimental to the public good, in view of the wonders of air craftsmanship, with the radio dethroning the hitherto undisputed dominion of the press in the field of daily transmission of current thought. The movies and the vitaphone are supplanting the so-called "legitimate drama." The Frigidaire and Kelvinator are rapidly scrapping the ice plants. The horse is disappearing with the advent of the tractor. The railroads are in a life and death struggle with the truck and motor bus companies, both keeping one eye on aerial navigation. Who can say whether and when electric current may settle the "annual spring coal strikes," or when the frigidaire system will end the summer exodus problem. Science and time alone can tell.

Returning from the realm of speculation to the bed rock of realities, what are the jurisdictional facts upon which the Public Commission has couched its denial of statutory consent, in the *formula* cast for it by the Court of Appeals? "Prejudicial to the public interest" is predicated on the difference of engineering experts in their valuation of values between $315,750 and $518,000. The first full and complete answer, as it seems to me, is this. Assuming for argument that $315,000 is a fair valuation for sale purposes as computed by the Commission's engineer, and that $518,000 is an optimistic purchase price based on the purchaser's confidence in the intelligence of that rural community, in which these companies are located, and on its own ability to *educate* that intelligence, resulting in the extension of the sale of kilowatt hours by a more diversified use on the farm and in hamlet of modern labor and time saving devices, it is not proposed to issue bonds *on these companies*, on *that valuation*, but merely to transfer certificates of stock holdings, as part of general collateral of $7,000,000 (of which it forms $518,000) against a New York Trust Company bond issue there of $4,000,000 against the *total collateral*, thus deposited with it the rest of which collateral has been approved in the various States where the several holdings lie, and over which the Public Service Commission of Maryland has not even asserted jurisdiction. Even assuming that the "investing public" is one of the subject matters over which the Maryland Commission may, under proper conditions, assert jurisdiction, where shown to be detrimental to the public interest, is not such jurisdiction *limited* to those cases where a corporation created by, or operating in, Maryland, is offering to issue *its* securities on *its property* on valuations over which the Commission should in such cases exercise a wise control and some administrative discretion on behalf of the investing public here? But if the Guaranty Trust Company of New York (hard-headed bankers as we may assume they are) are satisfied with the value of the collateral irrespective of any possible difference there may be in the economic soundness on either side of the variation of expert opinion expressed with due allowance for the standards used by the experts in arriving at somewhat different conclusions on the values of these four electric properties, the possible difference of some $200,000 in $7,000,000 collateral, is not going to affect the intrinsic value of the $4,000,000 bond issue there made *on the sum total* of the collateral pledged.

What is the evidence in this record of the *"public detriment,"* assuming for the sake of argument that there is an overvaluation, and that the Commission's engineer is correct, and the purchaser's engineers are wrong?

The testimony is all gotten from two witnesses, Mr. Emory L. Coblentz and Mr. R. Paul Smith. Both of them admittedly credible and reliable witnesses. Both of them officers, and executive officers, of the Potomac Edison Electric Company operating in that locality, and which company is protesting this sale, and itself *wants to buy all of these four properties,* and believes it ought to have them, and asserts they are worth more to it than to anyone else (record, p. 52), and that said company stands ready and willing to buy at any time, at any price the Public Service Commission will approve and which will be fixed by any reliable engineers, and Mr. Coblentz frankly admits that Day & Zimmerman are engineers of "outstanding reputation," though never employed by his electric company (The Potomac Edison Co.). Some force is sought to be made of the fact that Mr. Coblentz, when pressed by counsel for Public Service Commission would not say that his company would be willing to buy the properties for $468,000 subject to the outstanding $50,000 bond issue. Can even the business or commercial sense of the judicial mind (not thought by some to be generally very intense), be blind to the fact that a company desiring to buy, and hoping to be able to buy if this non-consent of the Commission to the transfer of stock certificates can be successfully upheld, does not hereafter want to be confronted with or estopped by an expressed consent to a purchase price, if it should be fortunate enough later in strategic manoeuver to "dicker" for the acquisition of these four properties?

Is my statement above warranted in this record that the Potomac Edison Company is a *protestant* against this sale or transfer to the petitioner, in view of the testimony in the record by Mr. Smith, vice-president of said company, that they are not *protestants?* They are *in fact,* but not *in form.* They claim to be advised by counsel that technically they are not so in form and do not appear in such official capacity, whether this technical interpretation is correct, is wholly beside the question. *That they are so in fact* can hardly be disputed.

Here is the legal fiction in the record on which the judicial formula, molded for the Commission by the Court of Appeals, is accepted, adopted and executed.

Coblentz (record, p. 34) :

"Obviously when securities are issued against properties at an inflated value, why the investing public is, to that extent injured." (But he does not profess to know the values of *these four properties.*)

"When there is a case of gross overcapitalization of a utility, *requiring the payment of a fixed charge* on this overcapitalization, there is an undoubted *tendency* on the part of any operator, I don't care who he is, of a property, in order to meet the inevitable fixed charge that is ahead of him or before him, to cut out, as far as possible, those things in the operation of a company which may not, for the time being, seem absolutely necessary, but which is a great contributing factor to the general service rendered to the public, and to that extent it affects the service to the public beyond a question." (Italics by the Court.)

R. Paul Smith (vice-president of the same company), when later testifying, adopts substantially the same thought as previously expressed by Mr. Coblentz. the chairman of the board of directors of his company.

It seems to me there are two answers to this testimony:

1. (a) That it is predicated on *gross* overcapitalization.

(b) Where securities are issued *against said gross overcapitalization* and thereby become a *fixed charge* against the company—neither of which is shown by this record;

2. That a complete answer to both, even if shown to exist, is that both rate and service are matters under the jurisdiction of the Commission, and that neither can the rate be increased nor the service diminished or impaired, *but by its assent,* and that, therefore, in neither case could it have the effect contended for, even if the factors alleged were present, *actively operating,* as an incentive to one or the other, or both.

Therefore, it seems to me the action of the Public Service Commission, in

its order of April 26th, 1928, is but the *verbal* adoption of a formula, *without substance of evidence to sustain it*, and therefore, in the technical language of the law is what is known as "unreasonable" and "arbitrary," without meaning to use either of the legal terms in any *personal* or *offensive sense*. Sometimes the law uses the term "fraud" when it has reference to the fiction known as "constructive fraud," begotten of a confidential relationship, and where it *imputes* legal or constructive fraud to parties, as a matter of public policy, even when they feel they have acted in perfectly good faith, but without due regard for some of the legal requirements as recognized and required by judicial tribunals.

Wherefore, this cause is again remanded to the Public Service Commission of Maryland, this Court having no authority or jurisdiction to direct the consent necessary for such transfer of stock certificates.